IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CARMEN GARRETT,** § | **CIVIL ACTION NO.: 4:18-cv-723** |
| Plaintiff, § | |
| § | |
| v. § | |
| § | |
| **ENBRIDGE ENERGY COMPANY,** § | **JURY DEMAND** |
| **INC.** § | |
| Defendant. § | |
| § | |
| § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT
---

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

NOW COMES Plaintiff Ms. Carmen Garrett (hereinafter referred to as "Plaintiff") in the above-referenced matter, complaining of and about Defendant Enbridge Energy Company, Inc. (hereinafter reffered to as "Enbridge"), and for cause of action files this Original Complaint, showing to the Court the following:

### I.   PARTIES

1.   Plaintiff Ms. Carmen Garrett is an individual residing in Houston, Harris County, Texas.  Plaintiff is a citizen of the United States and the State of Texas.

2.   Defendant Enbridge, is a foreign for-profit corporation authorized to conduct business in the State of Texas.  Defendant may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan St. Suite 900, Dallas, Texas, 75201-3136. On February 27, 2017, Enbridge and Spectra Energy Corp. (hereinafter refferd to as "Spectra"), merged into Enbridge.

## II.        JURISDICTION

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's causes of action arise under federal statute: Title VII of the Civil Rights Act of 1964 (as amended) (which is codified in 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a)) (hereinafter referred to as "Title VII").

4.     Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's similar state claims that arise under the Texas Commission on Human Rights Act, which is codified in Chapter 21 of the Texas Labor Code, Texas Labor Code § 21.001 et seq. (hereinafter referred to as the "TCHRA"), because such claims are so related to the claims within the Court's original jurisdiction, they form part of the same case or controversy under Article 3 of the United States Constitution.

5.     Venue is proper in the Southern District of Texas - Houston Division pursuant to 28 U.S.C. § 1391(a) because this is the judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

## III.        NATURE OF THE ACTION

6.     This is an action brought pursuant to Title VII and the TCHRA on the ground that Plaintiff was discriminated and retaliated against because of Plaintiff's national origin (Puerto Rican), Plaintiff's race (Hispanic), Plaintiff's sex (female) and in retaliation for her complaints of discrimination.  This action is to correct and recover for Defendants' unlawful employment practices on the basis of Plaintiff's national origin, race and sex, including the discrimination and retaliation based on Plaintiff's protected complaints of discrimination.  See 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a); 42 U.S.C. §§ 1981 and 1983; and Texas Labor Code § 21.001 et seq.

## IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     On August 13, 2015, Plaintiff filed a charge with the U.S. Equal Employment

Opportunity Commission (hereinafter referred to as the "EEOC") against Defendant for national origin discrimination, race and sex discrimination and retaliation (Charge No. 460-2015-03780). This charge was filed for discrimination and retaliation. (See Exhibit 1, which is attached hereto and incorporated by reference).

8.  Subsequently, the EEOC issued Plaintiff a Notice of Right Sue, dated December 7, 2017. (See Exhibit 2, which is attached hereto and incorporated by reference). Plaintiff files this lawsuit within ninety (90) days of receiving the Right to Sue notice. Therefore, this lawsuit is timely filed.

## V.   FACTS

9.  Plaintiff is a Hispanic woman of Puerto Rican descent.

10. Plaintiff was hired by Triad Resources (hereinafter reffered as "Triad") as an SAP SRM Business Analyst and placed to work at Spectra on December 19, 2014.

11. Plaintiff is a an exceptionally qualified analyst and more than skilled to performed the job she was assigned to at Spectra.

12. Plaintiff's Manager at Spectra was Christopher Collins (Caucasian, American, male).

13. When Plaintiff first began working for Spectra[1] she was assigned to work with Mr. Mallik (Arjun) Ghattamneni (Asian, Indian, male). Shortly after Plaintiff began working with Mr. Ghattamneni, she began to realize that he had serious issues with assigning her work and that he seemed to single her out on the basis of her national origin, race and sex. Plaintiff also quickly learned that Mr. Collins was going to do nothing to help her with her issues with Mr. Ghattamneni despite her repeated complaints.

---

[1] Spectra was subsequently purchased by Defendant.

14. Shortly after Plaintiff was assigned by Triad to work at Spectra, around January 6, 2015, Plaintiff asked Mr. Collins for access to the SAP/SRM Shared Mail box and a phone for her desk. Mr. Collins told Plaintiff to discuss this with Mr. Ghattamneni. Neither Mr. Collins nor Mr. Ghattamneni ever did anything to get Plaitntiff what she needed and she continued to work without a desk phone and without the Mail box despite the fact that her similarly situated male, non-Hispanic, co-workers were provided with both of these items. This was the beginning of a pattern that continued until Plaintiff was terminated. Mr. Ghattamneni and Mr. Collins continually ignored Plaintiff's requests and did not allow Plaintiff the tools she needed to do her job.

15. Mr. Ghatamneni would always allot projects to the Indian and male analysts at the detriment of Plaintiff. He also favored the males and Indian analysts when it came to giving them the tools they needed to do their jobs.

16. On February 10, 2015, Plaintiff told Mr. Collins that she had asked the Service Desk to create a ticket to acquire the license for her to use a tool that is useful for testing and ticket resolution and which would help her to do her job. It was frequently used by analysts and Plaintiff had seen that male and Indian, co-workers had been allowed to get it. After several efforts to get access to this tool Plaintiff eventually gave up because it was clear that neither Mr. Ghattamneni nor Mr. Collins had any intention of helping her to acquire the license for the software. This was becoming quite typical of the requests Plaintif made. For instance, on February 3, 2015, Plaintiff requested access to PS Systems for US but she did not get it although Mr. Ghattamneni promised her that they would talk about it.

17. In or around February, 2015, Plaintiff sent an email to Mr. Collins and copied Mr. Ghattamneni regarding a process that needed to be repaired. This email was intended for three

people only. Plaintiff later learned that this email had been forwarded to several other people within the company; some of whom held upper management positions. Unfortunately that email was not well received and Plaintiff was told by Mr. Collins that he had been reprimanded because of her email. Mr. Collins became very angry about this and blamed Plaintiff for forwarding the email although she had not. Plaintiff spent a lot of time convincing Mr. Collins that she had not done this and because he would not believe her. Plaitiff asked Mr. Collins to contact Mr. Ghattamneni about the email because she was sure that it was he that had sent the email around to members of management without her knowledge. Plaintiff also explained to Mr. Collins that Mr. Ghattamneni was treating her poorly and creating a hostile work environment for her. Mr. Collins, although he was still skeptical, eventually called Mr. Ghattamneni into his office and Mr. Ghattamneni confessed that it was him who had forwarded the email without Plaintiff's consent.

18. On February 24, 2015, Plaintiff was told by a co-worker, Carol Glasgow, that Mr. Collins had approached her and asked her to talk to Plaintiff about providing a knowledge transfer. Plaintiff started working on the job immediately. However, when Mr. Ghattamneni found out about the knowledge transfer he told Ms. Glasgow to stop this knowledge transfer and also told her that all instructions or questions should be directed to him instead of Plaintiff. It was clear the Mr. Ghattamneni was doing whatever he had to do to make sure that Plaintiff would not be successful.

19. On February 26, 2015, Plaintiff emailed Mr. Collins about Mr. Ghattamneni's blocking her from providing training to Ms. Glasgow. Plaintiff also spoke to him in person about the incident on February 27, 2015. On March 3, 2015, Plaintiff explained the situation to Ms. Leila Sinfuego, Senior Client Development Executive at Triad. Plaintiff explained to Ms.

Sinfuego what was happening at Spectra and specifically referenced Mr. Ghattamneni's and Mr. Collin's failure to do anything about the discrimination she was feeling from Mr. Ghattamneni.

20.     After Plaintiff complained to Mr. Collins about Mr. Ghattamneni the working relationship between him and Plaintiff worsened. Mr. Ghattamneni became even more hostile and found fault in everything Plaintiff did. Mr. Ghattamneni began to leave Plaintiff out of the meetings that as a business analyst she needed to participate in. He also isolated Plaintif and gave her nothing to work on. Plaintiff would request access to information or access to transactions/applications and Mr. Ghattamneni would not give her the access she needed even though it was important to do her job. Every time Plaintiff would respond to an end user Mr. Ghattamneni would come back to her to tell her that it was wrong.  He then told Plaintiff that she was required to consult with him every time she did anything in order to make sure that what she was telling the end users was correct.  This was very upsetting to Plaintiff as she had been doing this job successfully for years and there was absolutely no need for such micromanagement given her experience and skills.

21.     On March 13, 2015, Plaintiff was assigned to help with downloading files which were later going to be used for a critical deployment of a new application. Although Plaintiff provided feedback about the inaccuracy of the data, her expertise was completely disregarded by Mr. Ghattamneni as nonsense. Another female business analyst made similar assessments at the time, however, both women were ignored and nothing was done to correct the quality of the data. This project was led by Mr. Ghattamneni and coordinated with a group of male developers who all had Indian backgrounds.

22.     On March 19, 2015, Plaintiff sent an email to Mr. Collins offering to assist with technical interviews with potential job applicants. This request was ignored.

23. On March 19, 2015, Plaintiff tried to discuss with Mr. Collins her ideas and input regarding team building activities and disconnections associated to gender, race, culture, age and experience. Plaintiff offered to discuss the topic related to bullying in the workplace. Plaintiff's ideas and request were utterly disregarded.

24. Unable to work under the hostile environment any longer, on March 23, 2015, Plaintiff sent a detailed email to Mr. Collins about the hostile work environment, discrimination, and the bullying she was suffering from Mr. Ghattamneni. It is Plaintiff's understanding that Ms. Sinfuego later followed up with Mr. Collins about Plaintiff's complaints. Mr. Collins assured Ms. Sinfuego that he was going to resolve the matter internally and was going to have a meeting with Mr. Ghatammneni and Plaintiff to discuss a resolution. Ms. Sinfuego advised Plaintiff that she asked if she could be present but Mr. Collins rejected Ms. Sinfuego's request.

25. By March 25, 2015, Plaintiff had become so mentally exhausted by the stress she had been put under by Mr. Ghattamneni and Mr. Collins that she was forced to stay home and to take a sick day. That same day Plaintiff had a conference call with Triad's Human Resources representative, Felicia Bess, and Ms. Sinfuego. During this call Plaintiff explained in detail the discrimination, bullying and harassment she was suffering from Mr.Ghattamneni based on her sex, national origin and race. Plaintiff also sent two You Tube videos to Ms. Sinfuego and Mr. Collins regarding the "Four Types of Workplace Bullies" and told them that the type of bullying depicted in the videos was exactly what was happening to her at work by Mr. Ghattamneni.

26. Following this call Plaintiff was informed that Ms. Sinfuego contacted Mr. Collins and requested a meeting with him, Plaintiff and Ms. Bess. Plaintiff later learned that Mr. Collins had rejected the meeting and instead had proceeded to have a meeting of his own with members of Spectra's Human Resources ("HR") Department.

27. The same day, on March 25, 2015, Plaintiff received a call from Ms. Sinfuego and was told not to report to work the following day. Plaintiff was also invited to participate in a meeting with Spectra's HR department on March 26, 2015.

28. Mr. Collins attended the March 26, 2015, meeting along with Spectra HR Manager, Libby Shortner and another one of Spectra's HR representatives. Ms. Sinfuego also attended. During this meeting Plaintiff was asked numerous questions about her discrimination complaints. When Plaintiff was asked whether she believed that she had been discriminated against on the basis of her sex, she specifically told everyone at that meeting, "Definitely yes!" Plaintiff also told the group that she felt the hostile environment and bullying was also due to the fact that Mr. Ghattamneni was Indian and he was discriminating against her on the basis of her national origin and race.

29. After this meeting, Mr. Collins walked Plaintiff to the lobby and told her to stay home without pay. Mr. Collins also told Plaintiff not do any work from home until the investigation was completed. While Plaintiff was at the lobby, Ms. Sinfuego brought Plaintiff some of her personal belongins and asked her if she was planning to resign. Plaintiff responded to Ms. Sinfuego, "why would I resign"?. Later Plaintiff was told by a co-worker that this person had overheard Mr. Collins speaking to Mr. Ghattamneni. Mr. Collins was referring to Plaintiff and he told Mr. Ghattamneni, "don't worry, I've got your back. If she (Plaintiff) comes back (to work on the) 7th Floor, I will send her home!" At this point it was abundantly clear that Mr. Collins had no intention of "investigating" Plaintiff's claims and that both Mr. Ghattamneni and Mr. Collins were doing everything they could to ensure that Plaintiff would be fired.

30. On April 2, 2015, Plaintiff reported all of the above, including the discrimination, harassment and retaliation to the Spectra Ethics Line. At that point Plaintiff was forced to stay at

home without pay until Triad or Spectra would allow her to come back to work.

    31.    On April 13, 2015, Plaintiff was invited to participate in a meeting about her discrimination complaints. Plaintiff met with Ms. Shortner and Ms. Sinfuego as well as "Colleen," Spectra's Corporate Security Manager. During this meeting Plaintiff was interrogated as if she was the one who had brought on all of these problems for Spectra. "Colleen," even alleged that she had evidence that two Spectra employees had come forward and said that Plaintiff had invited Mr. Ghattamneni to dinner so that Plaintiff could have her husband physically harm him. Plaintiff was absolutely appalled by these allegations. Not only was this untrue, but it was absolutely shocking that Plaintiff was now being accused of being the harasser instead of Mr. Ghattamneni. It was very obvious to Plaintiff at this point that Spectra was trying to force her out and that it would even manufacture evidence if that is what it needed to do to get rid of her.

    32.    During this meeting, Plaintiff was constantly pressured to sign a written statement about the events that had occurred and about her discrimination complaints. After briefly perusing the document Plaintiff noticed that the statement needed corrections and that some of the statements were not true. Ms. Shortner kept assuring Plaintiff that they were correct but surely she, the victim, would know what was correct and what was not.

    33.    Plaintiff advised everyone that she would need to take the document home and to bring it back with edits if they wanted her to sign it. No one at the meeting would agree to that. At that point Plaintiff was asked if she had anything to add and she told the women that she did. Plaintiff told them that she had been sent home on March 26, 2015, without pay although she was always able and willing to work at the office or from home. She had worked from home in the past and other team members (males) were actually working from home. Plaintiff also

explained that what she had been through was clear retaliation. The HR manager quickly interrupted this line of talk and glibly asked what kind of work Plaintiff could do from home. Plaintiff gave her a list of work related activities that she could easily have performed without even having to talk to Mr. Ghattamneni. Nevertheless Plaintiff was not allowed to work from home and no satisfactory reason was ever given to her as to why she could not.

34. In essence Plaintiff detailed every instance of discrimination and retaliation which she had been subjected to in this meeting in order to make it very clear to both Triad and Spectra exactly what her complaints were.

35. On April 14, 2015, Plaintiff got a call from Ms. Sinfuego which instructed her to go back to the Spectra offices and to sign the statement that she had already refused to sign based on its inaccuracies. Plaintiff informed Ms. Sinfuego that she would be happy to review the document and advised her to send it via email. That same day Ms. Shortner sent an email also pressuring Plaintiff again to sign the statement.

36. On April 17, 2015, Plaintiff was informed that her network access had been removed. Again that day Ms. Sinfuego sent Plaintiff an email asking her to return to Spectra to sign the statement.

37. On April 21, 2015, Plaintiff made an appointment with a psychologist and scheduled appointments for weekly visits and potential medication based on the stress and anxiety that her employment with Spectra and Triad had caused. To this day, Plaintiff is still under medical treatment and taking medication as a result of the anxiety caused by Defendant's actions.

38. On April 24, 2015, Plaintiff learned from Ms. Sinfuego that Spectra claimed that it had not found anything to support her claims. Plaintiff also learned that Spectra had not found

anything to support the allegations that she had made threats against Mr. Ghattamneni. At that point Plaintiff told Ms. Sinfuego that she had retained an attorney to protect herself and that all communications should be channeled through her attorney from that point forward.

39. Plaintiff's employment with Triad and Spectra was terminated on the same day.

### VI. COUNT 1 - TITLE VII NATIONAL ORIGIN DISCRIMINATION

40. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

41. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her national origin (Puerto Rican), including discrimination, harassment, retaliation, and creating a hostile work environment.

42. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's national origin (Puerto Rican), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

### VII. COUNT 2 - TCHRA NATIONAL ORIGIN DISCRIMINATION

43. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

44. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her national origin (Puerto Rican).

45. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or

adversely affect Plaintiff's status because of Plaintiff's national origin (Puerto Rican), in violation of Texas Labor Code § 21.051 et seq..

## VIII. COUNT 3 - TITLE VII RACE DISCRIMINATION

46. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

47. Defendant, intentionally engaged in unlawful employment practices involving Plaintiff because of her race (Hispanic), including discrimination, harassment, retaliation, and creating a hostile work environment.

48. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's race (Hispanic), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

## IX. COUNT 4 - TCHRA RACE DISCRIMINATION

49. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

50. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her race (Hispanic).

51. Defendants discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect Plaintiff's status because of Plaintiff's race (Hispanic), in violation of Texas Labor Code § 21.051 et seq..

## X.  COUNT 5 - TITLE VII GENDER DISCRIMINATION

52.  Plaintiff reasserts and incorporates by reference all of the above numbered paragraphs.

53.  Defendant, intentionally engaged in unlawful employment practices involving Plaintiff because of her sex (female).

54.  Defendants' actions demonstrate they also engaged in discrimination, harassment, retaliation, and creating a hostile work environment against Plaintiff because of her gender (female).  Defendants' treatment against Plaintiff affected the compensation, terms, conditions, and privileges of Plaintiff's employment in violation of federal discrimination laws; or, limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect Plaintiff's status as an employee because of Plaintiff's sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

## XI.  COUNT 6 - TCHRA GENDER DISCRIMINATION

55.  Defendants intentionally engaged in unlawful employment practices involving Plaintiff because of her gender (female).

56.  Defendant, discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect Plaintiff's status because of Plaintiff's gender (female), in violation of the Texas Labor Code § 21.051 et seq..

## XII.  COUNT 7 - TITLE VII RETALIATION

57.  Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

58. Defendant intentionally retaliated against Plaintiff because of the complaints made to Defendants about the national origin discrimination, race discrimination and sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a).

## XIII. COUNT 8 - TCHRA RETALIATION

59. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

60. Defendant, intentionally retaliated against Plaintiff because of the complaints made to Defendants and the EEOC about the national origin discrimination, sex discrimination, age discrimination, and disability discrimination, in violation of the Texas Labor Code § 21.055.

## XIV. JURY DEMAND

61. Plaintiff demands a jury on all issues to be tried in this matter. Plaintiff submits the jury demand and herein submits the jury fee.

## XV. PRAYER

62. WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

    a. All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendments thereto, including but not limited to back pay, future wages, reinstatement, upgrading, and compensation for benefits not received;

    b. Compensatory damages, including, but not limited to, emotional distress;

    c. Past, present, and future physical pain and mental suffering;

d.  Punitive damages;

e.  Liquidated damages;

f.  Reasonable attorneys' fees, as allowed by law (with conditional awards in the event of appeal);

g.  Pre-judgment interest at the highest rate permitted by law;

h.  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

i.  Costs of Court; and

j.  Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any proper amendments thereto.

Respectfully submitted,



Alfonso Kennard, Jr.
Texas Bar No.: 24036888
Southern District No: 713316
2603 Augusta Drive, Suite 1450
Houston, TX  77057
Telephone No.: (713) 742-0900
Facsimile No.: (713) 742-0951
Alfonso.Kennard@kennardlaw.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

**OF COUNSEL FOR PLAINTIFF:**



Keenya R. Harrold
Texas Bar No.: 24039664
Southern District Bar No: 897938
2603 August Drive, Suite 1450
Houston, TX  77057
Telephone No.: (713) 742-0900
Facsimile No.: (713) 742-0951
Keenya.Harrold@kennardlaw.com